[Cite as *State v. Lollis*, 2014-Ohio-684.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 26607 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| ALAN C. LOLLIS | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. 11 11 3220(B) |

DECISION AND JOURNAL ENTRY

Dated: February 26, 2014

---

MOORE, Presiding Judge.

{¶1}    Defendant, Alan C. Lollis, appeals from his conviction in the Summit County Court of Common Pleas.  We affirm in part, reverse in part, and remand this matter for further proceedings consistent with this opinion.

I.

{¶2}    On July 19, 2011, Salim Suleiman was fatally shot outside of Kelley's Carryout in Akron, Ohio.  The Summit County Grand Jury indicted Mr. Lollis and another man, Gevonte Hunter, on the following charges stemming from these incidents: one count of aggravated murder in violation of R.C. 2903.01(B), one count of murder in violation of R.C. 2903.02(B), and two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) and (A)(3), with gun specifications attendant to all counts pursuant to R.C. 2941.145.  Mr. Lollis pleaded not guilty to the charges, and the case proceeded to jury trial.  Although the indictment charged both Mr.

Lollis and Mr. Hunter with the principal offenses, at trial the State proceeded on a theory that Mr. Lollis was complicit in the crimes. The jury found Mr. Lollis guilty on all charges.

{¶3} In a sentencing entry issued on July 31, 2012, the trial court merged all of the counts, and sentenced Mr. Lollis on the aggravated murder conviction and gun specification to a total term of incarceration of thirty-three years to life. Mr. Lollis timely appealed from the sentencing entry, and he now presents four assignments of error for our review. We have re-ordered the assignments of error to facilitate our discussion.

II.

**ASSIGNMENT OF ERROR II**

[MR. LOLLIS'] CONVICTIONS FOR AGGRAVATED MURDER, MURDER, AND AGGRAVATED ROBBERY WITH GUN SPECIFICATIONS THERETO WERE BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW.

{¶4} In his second assignment of error, Mr. Lollis maintains that his convictions were not supported by sufficient evidence. We disagree.

{¶5} The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When considering a challenge to the sufficiency of the evidence, the court must determine whether the prosecution has met its burden of production. *Id.* at 390 (Cook, J. concurring). In making this determination, an appellate court must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Circumstantial evidence has the same probative value as direct evidence. *See id.* at paragraph one of the syllabus.

{¶6} In regard to Mr. Lollis' convictions for aggravated murder and murder, R.C. 2903.01(B) provides that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape." R.C. 2903.02(B) provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶7} In regard to aggravated robbery, R.C. 2911.01 provides, in relevant part:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶8} R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a) require a court to impose a three-year mandatory prison term where the indictment "specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A).

{¶9}    Although Mr. Lollis was charged with the above principal offenses, the State proceeded against Mr. Lollis on the theory that he was complicit with Mr. Hunter in the commission of these crimes.  R.C. 2923.03(F) provides that "[a] charge of complicity may be stated in terms of this section, or in the terms of the principal offense."  Ohio's complicity statute provides:

> (A) No person acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

R.C. 2923.03(A).  In order to support a conviction based upon a defendant's complicity through "aiding and abetting:"

> [T]he evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.  Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240, 245 (2001).  Therefore, to be complicit through aiding and abetting, the accused must have taken some role in causing the commission of the offense.  "[T]he mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor."  *State  v. Widner*, 69 Ohio St.2d 267, 269 (1982).

{¶10} As part of the State's case-in-chief, it produced the testimony of Lashawna Boswell, Mr. Suleiman's brother Fadi Suleiman, law enforcement officers from the City of

Akron Police Department, employees of cellular telephone service providers, Tasha Thomas, and employees of the Summit County Jail.

{¶11} Lashawna Boswell testified that she is Mr. Hunter's aunt. Ms. Boswell's cousin lives on Fernwood Drive close to Kelley's Carryout, and there is cut through a yard that is adjacent to her cousin's house, on which people can walk to get to Kelley's. From her cousin's living room, she can see the cut through a picture window. On July 19, 2011, Ms. Boswell was drinking alcohol at her cousin's house. She thought that she saw Mr. Hunter's paternal grandmother drop Mr. Hunter off close by, and then believed that she saw Mr. Hunter walk by the Fernwood residence on the cut. About a minute later, her cousin informed her that she heard gunshots. They went outside and saw someone lying on the ground outside of Kelley's, while two employees of Kelley's stood nearby the body. After asking the Kelley's employees if they needed assistance, Ms. Boswell began performing CPR on the man, and continued to do so until police officers arrived.

{¶12} Responding officers testified that when they arrived at Kelley's, the victim, later identified as Mr. Suleiman, was lying in the parking lot, and he appeared to have an entry wound to his chest. Ms. Boswell was trying to assist him, and an officer took over administering CPR. The officers observed that Mr. Suleiman was lying in the parking lot near a green car, on which both front doors were open. The officers attempted to retrieve security camera footage from employees of Kelley's. However, the equipment was not working, and no footage was available. In the parking lot, the officers observed two shell casings, a cell phone, blood, and a spent bullet.

{¶13} Detective Mildred Morris testified that that she and her partner went to Kelley's to photograph and videotape the scene. The photographs and the video recording were admitted into evidence. Inside of the car, the detective photographed numerous items, including a Nokia

cell phone. The cell phone was located next to the crease in the seat and was partially covered by a $20 bill.

{¶14} Mr. Suleiman's brother testified that his brother had been driving his green Acura, and identified the Acura as the car officers photographed in the parking lot at Kelley's. He further testified that his brother had two cell phones, one of which was the phone discovered in the parking lot.

{¶15} Detective James Pasheilich testified that he was the lead detective assigned to this case. Detective Pasheilich arranged for Detective Guy Sheffield of the police department's computer forensics unit to examine the cell phones found at the scene. In regard to Mr. Suleiman's telephone, Detective Sheffield copied screen shots of certain text messages sent and received by Mr. Suleiman from the day of the shooting. These messages were between Mr. Suleiman and an individual utilizing a 480 area code, and listed in Mr. Suleiman's contacts as "Young Homie[.]" First, at 1:24 p.m., Young Homie sent a text to Mr. Suleiman stating: "My bad was stuk in traffic u n da hood[.]" Mr. Suleiman responded, "Nah will b later[.]" Later that afternoon, the two exchanged a series of texts between 4:59 and 5:07. First, Mr. Suleiman sent a text to Young Homie stating, "About to head back up my way..let me no I got a lil loud left[.]" Detective Pasheilich testified that "loud" is slang for marijuana. Young Homie then asks, "u at kellys," to which Mr. Suleiman replied, "I'm at the dairy mart were u at[.]" Young Homie then stated "on madison on my way to kellys[.]" Mr. Suleiman replied "Me to[.]" Young Homie then stated, "Meet me at kellys[.]" Mr. Suleiman replied "Yup I'm here[.]" Young Homie then sent the text "B there n 2mins[.]" Each of the text messages from Young Homie ended with the signature "$tackOr$tarve."

{¶16} Detective Sheffield testified that Detective Pasheilich also requested that he examine the Nokia cell phone found in Mr. Suleiman's car. An AT&T representative also testified in regard to the cell phone subscriber information. From the numbers and records provided, the detectives and the AT&T representative's testimony established that the cell phone recovered from the car was registered to Mr. Hunter's mother, Roxanne Ellerbe. Detective Sheffield further testified as to several text messages sent between the Nokia phone and a contact in the phone named "Bezz," whose phone number is listed as the same 480 number identified as that belonging to "Young Homie" on Mr. Suleiman's telephone. At 5:09, the Nokia phone received a text from Bezz which stated, "Wat up he on his way to kelly tare em up just hit me up wen u done[.]" A few seconds later, the Nokia phone user sent a text to Bezz asking, "Wat kinda car[?]" Bezz replied at 5:11 stating, "Lil kia mazda look like its green and were sun glases and long hair arab lite skin[.]" At 5:40 Bezz sent another message reading only "man u good" to the Nokia phone. At 5:47, the Nokia phone received two texts from Bezz stating, "Bro get to da east cut me n cal me asap," and "Im on da east side on fulton[.]" All of text messages from "Bezz" end with signature "$tackOr$tarve."

{¶17} Chris Sproul testified that he verifies records for law enforcement through his employment at Verizon Wireless. He received a subpoena relative to the records for the 480 number associated with Young Homie and Bezz as set forth above. He explained that Verizon does not maintain subscriber information for this number. However, Verizon did have the incoming and outgoing telephone call records from this phone together with text records. Mr. Sproul testified that the area code 480 is an area code for Gilbert, Arizona. However, the calls on the log were made from and received in Akron, Ohio.

{¶18} Tasha Thomas testified that a friend of hers named Santashae "Sandy" Bradley, and her boyfriend, Mr. Lollis, were staying at her house over the summer of 2011. While he was staying with her, Mr. Lollis told Ms. Thomas about a "robbery gone bad" at Kelley's. Mr. Lollis informed her that he had set up a robbery at Kelley's targeting "[s]ome Arab." Mr. Lollis explained to her that he was "texting some dude telling him what the dude in the car had on, what kind of car he was driving." Ms. Thomas testified that she knew Mr. Lollis by his nickname, "Bezel," and she had shown a detective the number for Alan Lollis that she had saved in her cell phone. Detective Pasheilich testified that this number matched the number of "Young Homie" and "Bezz[.]" Ms. Thomas further testified that when she received texts from Mr. Lollis, the signature line of the text would read "[s]tack and starve[.]" Ms. Thomas also provided the officers with Mr. Lollis' driver's license, which she stated he had left at her house. Ms. Thomas verified that she has a visible scar on her face.

{¶19} Nancy Mundy testified that she works for the Summit County Sheriff's Office recording jail inmate telephone conversations. Ms. Mundy authenticated telephone recordings, which were admitted into evidence. In one call, Mr. Lollis called a woman and told her that she needed to see "what is up with old girl" who said he stole a television and who "told the dicks I was that name[.]" Later on this call, Mr. Lollis repeats this sentiment and then tells the woman on the other end of the line that she needed to get as many people as possible to come to court to testify that he was Alan Lollis, not "Bezel." On another call, Mr. Lollis explains that no one knows him as Bezel, but the "bitch with a scar on her face who stay down the way," had told police that "Bezel" broke in and stole her television, and she had Mr. Lollis' identification from when he used to "mess around" with Santashae. However, in another call, a woman who answers the telephone refers to Mr. Lollis as "Bezz," and Mr. Lollis does not comment on this

reference or otherwise correct the woman as to his name. Later in the call, Mr. Lollis refers to himself as "Bezel," when relaying to the woman something he maintained her mother had said to him. On another call, a woman greets Mr. Lollis' call by saying "Hey, Bezel how you doing?" Again, Mr. Lollis does not comment on or correct the woman as to his name. In another call, Mr. Lollis explains to a man that he will call him off someone else's "line" later and tell him about what was going on. Later, a call is made to the same number from a different inmate's identification number. The caller says, "You know the bitch with the scar on her face on the Southside? * * * I need someone to pull her tight on that – that's on my paperwork to see what's going on with that bitch." Then, again a call is made to the same outside number from a different inmate identification number, in which the inmate asks "remember when I told you about that broad," and the inmate then asks if anyone ever got in touch with her. He also remarks that things were "looking real good" as long as "that broad's out of the way."

{¶20} Kelly Pongracz testified that she works at the Summit County Jail, and, during a period of time while she was supervising the inmate services in the commissary and mail, she received orders to copy the mail of Mr. Hunter and Mr. Lollis. One of these letters that was submitted into evidence was addressed from Mr. Lollis to Ms. Bradley, and reads in part:

> Wen we go to court make sure that you rember wen they ask you do u no a dud name bez or mess with him and u said yeah but don't no more that's kool but wen they ask who do you mess with now his name is Alan and we start talkn around February and make sure you tell yo ma to write me and let me no wat all she told the dicks so I can no wat to say and wat not to. I need to no wat sunny told them to and big will. Don't want to get up there and we all look n dum. Tasha lite weight f* * *ed me over wit my ID being at her house they got that to go so make sure she aint coming to court. And ask her wat she told them.

(Sic.)

{¶21} In his sufficiency challenge, Mr. Lollis first maintains that the State failed to produce proof of Mr. Lollis' purpose to cause Mr. Suleiman's death, a required element of the

aggravated murder charge. *See* R.C. 2903.01. However, "[a] jury can infer an aider and abettor's purpose to kill where the facts show that the participants in a felony entered into a common design and either the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony or the felony and the manner of its accomplishment would be reasonably likely to produce death." *State v. Scott*, 61 Ohio St.2d 155, 165 (1980), citing *State v. Lockett*, 49 Ohio St.2d 48 (1976), paragraphs three and four of the syllabus.

{¶22} Here, we conclude that the text messages provide sufficient evidence of a common plan between Mr. Lollis and Mr. Hunter to violently rob Mr. Suleiman. The evidence was also sufficient for the jury reasonably to infer the Mr. Lollis had knowledge that Mr. Hunter would be using a weapon or engaging in violence of a type reasonably likely to produce death, as he instructed Mr. Hunter to "tare em up[.]" Accordingly, pursuant to the Ohio Supreme Court's holdings in *Scott* and *Lockett*, there was sufficient evidence to sustain the aggravated murder conviction.

{¶23} Mr. Lollis next argues that there was insufficient evidence to sustain the three-year mandatory conviction on the firearm specification because there was insufficient evidence that Mr. Hunter used a firearm in the commission of the offense. Although there is no direct evidence that Mr. Hunter used a gun in the commission of the planned robbery, there exists circumstantial evidence from which a jury could reasonably infer that he did so. Ms. Boswell testified that she saw Mr. Hunter walk down the cut by Kelley's approximately a minute before the shots were fired, and the cell phone registered to Mr. Hunter's mother was found on the front passenger seat of Mr. Suleiman's car. When viewed in the light most favorable to the State, Mr. Hunter's presence at the scene a minute before Mr. Suleiman was fatally shot when combined with the plan between Mr. Hunter and Mr. Lollis to violently rob Mr. Suleiman provide

sufficient evidence that Mr. Hunter used a firearm in the commission of the offenses. In *State v. Chapman*, 21 Ohio St.3d 41 (1986), syllabus, the Ohio Supreme Court held:

> An individual indicted for and convicted of R.C. 2911.01, aggravated robbery, and R.C. 2941.141, a firearm specification, is subject to a mandatory three-year term of actual incarceration under R.C. 2929.71, regardless of whether he was the principal offender or an unarmed accomplice.

**{¶24}** Accordingly, sufficient evidence existed to support the imposition of sentence on the firearm specification against Mr. Lollis.

**{¶25}** Mr. Lollis next presents numerous innocent explanations accounting for the State's evidence. However, "if the State relies on circumstantial evidence to prove any essential element of an offense, it is not necessary for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." (Internal citations and quotations omitted.) *State v. Tran*, 9th Dist. Summit No. 22911, 2006-Ohio-4349, ¶ 13. Despite these alternate theories accounting for the evidence, our review of the record indicates that the evidence produced, when viewed in a light most favorable to the State, provided sufficient evidence to support Mr. Lollis' convictions.

**{¶26}** Accordingly, Mr. Lollis' second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

[MR. LOLLIS'] CONVICTIONS FOR AGGRAVATED MURDER, MURDER, AND AGGRAVATED ROBBERY WITH GUN SPECIFICATIONS THERETO WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶27}** In his third assignment of error, Mr. Lollis argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶28}** When a defendant asserts that his conviction is against the manifest weight of the evidence:

> [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten,* 33 Ohio App.3d 339, 340 (9th Dist.1986). In making this determination, this Court is mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." (Citations omitted.) *State v. Winchester*, 9th Dist. Summit No. 26652, 2013-Ohio-4683, ¶ 4.

{¶29} In support of his argument that his convictions were against the weight of the evidence, Mr. Lollis challenges the credibility of Tasha Thomas, the evidence pertaining to purposefully causing Mr. Suleiman's death, and the meaning of certain text messages.

{¶30} In regard to Ms. Thomas' testimony, Mr. Lollis maintains that Ms. "Thomas'[ ]gravely dubious credibility as a witness on this or any other matter was fully addressed under Assignment of Error Two above. In summary, her credibility can be summed up by the following: When asked how people would know when she was lying and when she was telling the truth, she said[,] 'You wouldn't.'" After our review of Mr. Lollis' second assignment of error, we can locate no reference to Ms. Thomas' credibility aside from a general assertion that it was "admittedly unreliable and incredible[.]" Thus, Mr. Lollis has failed to develop an argument on this point. This Court has held that, "[i]f an argument exists that can support [an] assignment of error, it is not this court's duty to root it out." *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). Therefore, we decline to review Mr. Lollis' assertion that Ms. Thomas was not credible.

{¶31} In regard to the evidence pertaining to Mr. Lollis purposefully causing Mr. Suleiman's death, Mr. Lollis argues that the testimony and evidence at most indicates that they

intended to rob Mr. Suleiman, not to kill him. However, from Mr. Lollis' text to Mr. Hunter instructing him to "tare em up," we conclude that this indicates that Mr. Lollis was instructing Mr. Hunter to engage in violence of a type reasonably likely to produce Mr. Suleiman's death. Nonetheless, Mr. Lollis challenges the interpretation of "tare em up," as meaning "tear him up." Mr. Lollis maintains that "tare em up" may have an alternate meaning. In support, Mr. Lollis cites Black's Law Dictionary for the definition of "tare" as a term used in reference to the weight of a commodity without its container or packaging. Mr. Lollis maintains that "tare em up" may have been a phrase used in reference to the weight of the usable marijuana. However, nothing in the record indicates that Mr. Lollis was utilizing a formal definition of "tare," and he makes no argument as to what the remaining "em up" would have referenced if he were using "tare" in this manner.

{¶32} Mr. Lollis further maintains, in regard to the text message: "man u good," that the State read this message as approving of Mr. Hunter's actions after the shooting. However, Mr. Lollis maintains that evidence demonstrates that he would not have known of Mr. Hunter's actions at 5:40 p.m., when this message was sent, because Mr. Hunter left his cell phone at the scene no later than 5:20 p.m., which is when the police received the dispatch that Mr. Suleiman had been shot. Instead, Mr. Lollis argues that evidence suggests that this text could be read as an inquiry into what had transpired with Mr. Hunter after a period of no communication. Although we would agree that this is a reasonable reading of this particular text, we conclude that the text messages, when read in conjunction with each other, indicate that Mr. Lollis was complicit in the violent robbery of Mr. Suleiman.

{¶33} After reviewing the entire record, weighing the inferences, and examining the credibility of witnesses, we cannot say that the jury clearly lost its way and created a manifest

miscarriage of justice in finding Mr. Lollis guilty of the charges. Accordingly, Mr. Lollis' third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

[MR. LOLLIS]' CONVICTIONS FOR AGGRAVATED MURDER, MURDER, AND AGGRAVATED ROBBERY WITH GUN SPECIFICATIONS THERETO WERE VOID AS A MATTER OF LAW.

{¶34} In his first assignment of error, Mr. Lollis argues that the trial court erred in failing to properly instruct the jury on complicity by erroneously instructing it on conspiracy in regard to the aggravated murder charge. We disagree.

{¶35} A trial court must charge a jury with instructions that are a correct and complete statement of the law. *Marshall v. Gibson*, 19 Ohio St.3d 10, 12, (1985). However, the precise language of a jury instruction is within the discretion of the trial court. *Callahan v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 22387, 2005-Ohio-5103, ¶ 6; *Youssef v. Parr, Inc.*, 69 Ohio App.3d 679, 690 (8th Dist.1990). In reviewing jury instructions on appeal, this court has previously stated:

> [A]n appellate court reviews the instructions as a whole. If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party.

(Citations omitted.) *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993).[1]

---

[1] In his first assignment of error, Mr. Lollis argues that his conviction *is void* due to the trial court's purported error in instructing the jury. However, Mr. Lollis has directed this Court to no authority supporting this proposition. *See* App.R. 16(A)(7) (appellant's brief to contain citations to authorities on which appellant relies).

{¶36}  Here, as set forth in our discussion of Mr. Lollis' second assignment of error, the State's theory of Mr. Lollis' liability rested on his role as an accomplice in the aggravated robbery and murder of Mr. Suleiman.  In his brief, Mr. Lollis maintains that the trial court did not instruct the jury on complicity with regard to the charges, and, instead, "the trial court expressly instructed the jury on conspiracy – and only on conspiracy – as the grounds for finding guilt on the [a]ggravated [m]urder charge."

{¶37}  However, the record demonstrates that the "conspiracy" instruction of which Mr. Lollis complains is located within a larger instruction pertaining to complicity, which follows:

> In considering the crimes charged in the indictment and specifications, there is an additional proposition that you need to understand, and that is the concept of complicity as an aider and a[b]ettor.
>
> A person who knowingly aids, abets, solicits, procures, conspires, supports, assists, encourages, cooperates with, advises, incites or associates himself with another for the purpose of committing or in the commission of a crime is regarded as if he were the principal offender and is to be viewed as guilty as if he personally performed every act constituting the offense.
>
> When two or more persons have common purpose to commit a crime, and one does one part and the second performs another, those acting together are equally guilty of the crime.
>
> *If you find from the evidence beyond a reasonable doubt that the Defendants conspired to rob the alleged victim, and that the Defendants purposely engaged in conduct to carry out the conspiracy, and that the means used to carry out the conspiracy would be reasonably likely to produce death, and that one Defendant purposefully caused the death of the alleged victim, and that the death was the natural and probable consequence of the agreed criminal conduct, then both Defendants may be found guilty of aggravated murder, even though they did not agree to such killing prior to engaging in criminal conduct.*
>
> Mere presence of the accused during the crime does not make him complicit or guilty of an offense.
>
> The mere association with one * * * who perpetrates an unlawful act does not render him a participant in the crime so long as his acts are innocent.
>
> Aid or abet means to support, assist, encourage, cooperate with, advise or incite.

Solicit means to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear.

Procure means to get, obtain, induce, bring about, or motivate.

Conspires is the planning or aiding in the planning of a commission of an offense with one or more persons with a purpose to commit the commission of the specific offense.

(Emphasis added.)

**{¶38}** When discussing the complicity instruction with counsel, the trial court indicated that it was going to give an instruction that was referenced in *State v. Metz*, 1st Dist. Hamilton No. C-780117, 1979 WL 208681 (July 11, 1979), fn. 1. This instruction reads as follows:

If you find from the evidence beyond a reasonable doubt that the defendant and another person conspired to rob the alleged victim, and that one was armed with a deadly weapon, and that the defendant purposely engaged in conduct to carry out the conspiracy, and that the means used to carry out that conspiracy would be reasonably likely to produce death, and that the other person purposely caused the death of the alleged victim, and that the death was the natural and probable consequence of the agreed criminal conduct, then the defendant may be found guilty of aggravated murder, even though he did not agree to such killing prior to engaging in the criminal conduct.

*Id.*

**{¶39}** Mr. Lollis objected on the basis that there was no evidence that he knew that Mr. Hunter would be armed with a deadly weapon. After the court indicated that it removed the reference to a weapon, Mr. Lollis raised no other objection to the instruction. This Court has held:

A fundamental rule of appellate review is that a reviewing court will not consider as error any issue that a party was aware of but failed to bring to the trial court's attention.

(Internal citations omitted.) *State v. Powers*, 106 Ohio App.3d 696, 699 (9th Dist.1995). Mr. Lollis did not object to the instruction's references to conspiracy, and he has not made a plain error argument on appeal, nor has he provided a reason why this Court should address this issue

for the first time on appeal. *See State v. Gaiter*, 9th Dist. Summit No. 24758, 2010-Ohio-2205, ¶ 21, citing *In re L.A.B.*, 9th Dist. Summit No. 23309, 2007-Ohio-1479, ¶ 19 (declining to address plain error because the appellant had neither argued it nor explained why we should examine the issue for the first time on appeal).

{¶40} Therefore, Mr. Lollis' first assignment of error is overruled. *See State v. Murphy*, 9th Dist. Summit No. 24753, 2010-Ohio-1038, ¶ 7.

<u>**ASSIGNMENT OF ERROR IV**</u>

THE TRIAL COURT ERRED AS A MATTER OF LAW IN IMPOSING A MANDATORY PERIOD OF POST[R]ELEASE CONTROL FOR AGGRAVATED MURDER, A SPECIAL FELONY.

{¶41} In his fourth assignment of error, Mr. Lollis argues that the trial court erred in imposing postrelease control because his conviction is for a special felony. The State concedes this error, and we agree.

{¶42} "Aggravated murder is a special felony, and, therefore, Mr. [Lollis] is subject to parole, not post[r]elease control on that conviction." *State v. Hilliard*, 9th Dist. Summit No. 25831, 2011-Ohio-5895, ¶ 7. Therefore, "[t]he trial court erred by informing [Mr. Lollis] that postrelease control would be part of his sentence, and that portion of the sentencing order is void." *State v. Brown*, 9th Dist. Wayne No. 11CA0054, 2013-Ohio-2945, ¶ 62; *see also State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, ¶ 26. Accordingly, Mr. Lollis' fourth assignment of error is sustained, and "the matter is remanded to the trial court so that the sentencing entry may be corrected." *See Brown* at ¶ 62.

III.

**{¶43}** Mr. Lollis' first, second, and third assignments of error are overruled. Mr. Lollis' fourth assignment of error is sustained. The judgment of the trial court is affirmed in part, reversed in part, and this matter is remanded for correction of the sentencing entry as it relates to the imposition of postrelease control.

Judgment affirmed in part,
reversed part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
CARLA MOORE
FOR THE COURT

WHITMORE, J.
<u>CONCURS.</u>

CARR, J.
<u>CONCURS IN JUDGMENT ONLY.</u>


<u>APPEARANCES:</u>

NICHOLAS SWYRYDENKO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.