[Cite as *State v. Cannon*, 2020-Ohio-3765.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 19CA011536 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ABLINE CANNON | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 17CR095687 |

DECISION AND JOURNAL ENTRY

Dated: July 20, 2020

SCHAFER, Judge.

{¶1} Defendant-Appellant, Abline Cannon, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} During the middle of the night, two armed men broke into D.B.'s apartment. When they broke in, D.B. was in his bedroom and his twin brother was sleeping on the living room couch. The twin brother attempted to jump from the couch, but one of the intruders struck him on the head. Gunfire then erupted and shots were exchanged between the two men and D.B. After the exchange, the two men fled, and the twin brother briefly chased them. When he returned to the apartment, he found D.B. lying on his bedroom floor and called 911. Paramedics were unable to resuscitate D.B., and he died from his injuries.

{¶3} Dark conditions in the apartment made it impossible for D.B.'s twin brother to identify the intruders by sight, but he advised the police that one of them had left a bloodstain on

the wall next to the door as he fled. The police also found a trail of blood leading down the stairwell and across the apartment complex's parking lot. Believing that one of the intruders had been shot, the police asked local hospitals to be on the lookout for anyone seeking treatment for a gunshot wound. Within twenty minutes of that notification, Cannon arrived at Elyria Medical Center with a gunshot wound to his right arm.

{¶4} The police spoke with Cannon at the hospital, and he denied any involvement in the break-in at D.B.'s apartment. Although the police secured a warrant for his arrest, Cannon left the hospital against medical advice before the warrant could be served. The police then experienced several setbacks when they tried to find him. Cannon's family members changed their stories several times when asked for information about his whereabouts. Additionally, someone set fire to and destroyed the vehicle that had brought him to the hospital. Cannon managed to elude the police for almost four weeks. He was eventually captured while attempting to hide under a pile of clothes at the apartment of a lady friend. DNA testing conducted after his arrest confirmed that he could not be excluded as the source of the blood trail found at D.B.'s apartment.

{¶5} A grand jury indicted Cannon on one count of aggravated murder, one count of murder, one count of felony murder, one count of kidnapping, two counts of aggravated robbery, two counts of aggravated burglary, three counts of felonious assault, one count of tampering with evidence, and two counts of having weapons under disability. Of those fourteen counts, eleven counts also contained an attendant firearm specification. The matter proceeded to trial and, at its conclusion, a jury found Cannon guilty of thirteen counts and the specifications linked to those counts. The jury found him not guilty of murder.

**{¶6}** The parties agreed that all but four of Cannon's counts were allied offenses of similar import. Of those four counts, two carried a firearm specification and two did not. The parties agreed that the specifications would merge, and, at the start of the sentencing hearing, the court acknowledged the parties' entire agreement. The court sentenced Cannon on four counts and one firearm specification for a total of 40 years to life in prison. Yet, in its sentencing entry, the court failed to address the second firearm specification that the parties had agreed would merge ("the Count 11 specification"). When Cannon attempted to appeal from his convictions, this Court dismissed his appeal for lack of a final, appealable order. *See State v. Cannon*, 9th Dist. Lorain No. 18CA011419 (March 13, 2019).

**{¶7}** Following our dismissal, the trial court issued an "amended judgment entry of conviction and sentence nunc pro tunc," as well as a "second amended judgment entry of conviction and sentence nunc pro tunc." The amended entries set forth the terms of Cannon's original sentence and addressed the Count 11 specification, as well his other firearm specifications. Specifically, the entries sentenced Cannon on the firearm specification linked to his aggravated murder count and merged his remaining firearm specifications with that sentence. Cannon once again appealed from his convictions, but this Court dismissed his second appeal as untimely. *See State v. Cannon*, 9th Dist. Lorain No. 19CA011506 (June 3, 2019). Following our second dismissal, he moved to file a delayed appeal, and we granted his motion.

**{¶8}** Cannon now appeals from his convictions and raises three assignments of error. To facilitate our review, we consolidate two of his assignments of error.

II.

**{¶9}** Before turning to the merits of Cannon's assignments of error, we pause to address a motion that the State has filed herein. The State has moved to dismiss the appeal on the basis

that the trial court has yet to issue a final, appealable order. That is because, when the court orally pronounced Cannon's sentence at the sentencing hearing, it failed to address the merger of the Count 11 specification. According to the State, the court could not use a nunc pro tunc entry to remedy that failure. It argues that the court's purported nunc pro tunc entry does not reflect what occurred in open court, and therefore, is invalid. Because the entry is invalid, the State argues, the resolution of the Count 11 specification remains an issue, and no final, appealable order exists.

{¶10} For a sentencing entry to comply with Crim.R. 32(C) and be a final, appealable order, it must set forth "(1) the fact of the conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk." *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, paragraph one of the syllabus. On its face, the sentencing entry from which Cannon has appealed meets the foregoing requirements. It is time stamped, signed, includes that he was found guilty by a jury, and disposes of each of his counts and specifications. *See id.* The State's argument in favor of dismissal stems from the trial court's labeling of the entry as a "nunc pro tunc" and its failure to make one of the dispositions contained therein on the record at a sentencing hearing. Yet, those issues do not bear upon the finality of its entry.

{¶11} This Court has jurisdiction to hear appeals from final judgments pursuant to Ohio Constitution, Article IV, Section 3(B)(2) and R.C. 2501.02. So long as a court's judgment of conviction complies with Crim.R. 32(C), it is a final, appealable order. *State v. Claren*, 9th Dist. Wayne No. 17AP0030, 2019-Ohio-260, ¶ 8. The question of whether a court has exceeded its authority by issuing an improper nunc pro tunc is a distinct inquiry. *See State ex rel. Davis v. Janas*, Slip Opinion No. 2020-Ohio-1462, ¶ 13-16; *State ex rel. Mayer v. Henson*, 97 Ohio St.3d 276, 2002-Ohio-6323, ¶ 14. *See also State ex rel. Sneed v. Anderson*, 114 Ohio St.3d 11, 2007-Ohio-2454, ¶ 7, quoting *Majoros v. Collins*, 64 Ohio St.3d 442 (1992) ("'[S]entencing errors are

not jurisdictional * * *.'"). Because the sentencing entry from which Cannon has appealed complies with the dictates of Crim.R. 32(C), it is a final, appealable order. *See Lester* at paragraph one of the syllabus; *Claren* at ¶ 8. As such, the State's motion to dismiss is denied.

### Assignment of Error I

**The trial court's denial of [Cannon's] Crim. R. 29 motion for acquittal despite insufficient evidence to sustain the convictions deprived [Cannon] of substantive and procedural due process in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5, 9, and 16 of the Ohio Constitution.**

### Assignment of Error III

**[Cannon's] convictions for the gun specifications are not supported by sufficient evidence where the state failed to present evidence that [Cannon] shared the same mens rea as the principal offender(s).**

{¶12} In his first and third assignments of error, Cannon argues that his convictions and their attendant firearm specifications are based on insufficient evidence. We do not agree.

{¶13} This Court reviews the denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence. *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. A challenge to the sufficiency of a criminal conviction presents a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. After such an examination and taking the evidence in the light most favorable to the prosecution, we must decide whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶14} As previously noted, Cannon was found guilty of aggravated murder, felony murder, kidnapping, aggravated robbery, aggravated burglary, felonious assault, tampering with evidence, and having weapons under disability. His sufficiency challenge is not directed at any of the underlying elements of his various offenses. Instead, he argues that the State failed to prove either (1) his identity as the perpetrator, or (2) that he aided or abetted another in the commission of those crimes. Given the narrow focus of his argument, we decline to set forth the individual elements of his offenses. We limit our analysis to the issues Cannon has raised herein. *See* App.R. 16(A)(7).

{¶15} As with any other element, "[t]he identity of a perpetrator must be proved by the State beyond a reasonable doubt." *State v. Moorer*, 9th Dist. Summit No. 27685, 2016-Ohio-7679, ¶ 24. "[I]dentity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9.

{¶16} "A person need not be the principal offender to be convicted of a crime." *State v. Davis*, 9th Dist. Summit No. 26660, 2013-Ohio-5226, ¶ 11. R.C. 2923.03(A)(2) prohibits any person, "acting with the kind of culpability required for the commission of an offense, [from] * * * [a]id[ing] or abet[ting] another in committing the offense." "To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "Such intent may be inferred from the circumstances surrounding the crime," *id.*, and "the presence, companionship, and conduct of the defendant before and after the offense is committed." *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, ¶ 13. A purpose to kill may be inferred "'where the facts show that the participants in a felony entered into a common

design and either the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony or the felony and the manner of its accomplishment would be reasonably likely to produce death.'" *State v. Lollis*, 9th Dist. Summit No. 26607, 2014-Ohio-684, ¶ 21, quoting *State v. Scott*, 61 Ohio St.2d 155, 165 (1980).

{¶17} D.B.'s twin brother testified that, sometime around 11:00 p.m., he called D.B. to let him know that he would be coming to stay with him for the evening. D.B. was already in bed when his brother arrived, so the brother let himself in, bolted the apartment door, and eventually fell asleep on the living room couch. He testified that he was heavily asleep when he heard a noise and opened his eyes. He then saw a figure standing over him and tried to jump up from the couch. His attempt was unsuccessful, however, as the figure struck him in the head. The twin brother testified that the room was dark, but the injuries he sustained were consistent with his having been struck by a gun. After someone struck him, a voice he did not recognize exclaimed, "Oh, sh*t," and gunfire broke out in the apartment.

{¶18} The twin brother testified that, when the shooting started, the person who was standing over him ran toward D.B.'s bedroom. Multiple shots were then fired with bullets "flying from the back of the [apartment]," and glass from the stove exploding in the hail of gunfire. As the twin brother watched, he saw a person run from the apartment, followed by a second person "tripping over his own feet." He testified that the second person was bleeding and left his blood on the wall next to the door when he hit the wall on his way out of the apartment. Though the twin brother briefly chased after the two intruders, he came to his senses when he realized that he did not have a weapon and D.B. likely needed help. He then ran back up to the apartment, found his brother, and called 911.

{¶19} The twin brother was unable to describe the individuals who broke into the apartment, as it was dark inside when they attacked. He did confirm, however, that he only saw two people and a blood trail leading out of the apartment belonged to the second man. The twin brother acknowledged that D.B. was a drug dealer and owned a firearm. Yet, he denied that he or his brother had participated in a drug deal that evening. The State showed the twin brother a photograph of the front door of the apartment, and the photograph captured a partial shoe print on the door and damage from the door having been kicked in while the deadbolt was engaged. The twin brother confirmed that the damage was not present when he arrived at the apartment earlier that evening.

{¶20} A man from a neighboring apartment testified that he, his girlfriend, and their children were sleeping when they were awoken by the sound of gunshots. The neighbor's bedroom window faced the parking lot for the apartment complex and, as he dialed 911, he looked outside. The neighbor testified that he saw two men running. The first man ran toward a sports utility vehicle and jumped into the passenger's seat as the vehicle pulled out. Meanwhile, the second man ran along the right side of a smaller building that housed the complex's dumpster. The neighbor testified that the vehicle drove out onto the main roadway, but stopped briefly in a spot near the dumpster. He could not say exactly how many people were in the vehicle, but acknowledged that there must have been at least three: the two men he saw running and the driver.

{¶21} A registered nurse from the emergency room at Elyria Medical Center testified that he received a phone call from the police at 3:10 a.m. The police notified the nurse that a shooting had occurred in the city and asked that the hospital contact the department if any individuals sought treatment for a gunshot wound. Less than twenty minutes later, Cannon arrived at the emergency room with a gunshot wound to his right elbow. The nurse testified that Cannon had extremely low

blood pressure when he arrived and was heading into hypovolemic shock from significant blood loss. Cannon informed the nurse that he had been walking with a friend in Lorain when another man approached them, words were exchanged, and shots were fired. Cannon told the nurse that he was very concerned for his friend because they had run in separate directions. He also told the nurse that a female friend had driven him to the emergency room. The nurse testified that, once the Elyria Medical Center stabilized Cannon, an ambulance took him to the Cleveland Medical Center for additional treatment.

{¶22} Officer Brent Payne was at D.B.'s apartment for no more than fifteen minutes when he received notice that a male was seeking treatment for a gunshot wound at Elyria Medical Center. He testified that it took him about fifteen minutes to drive there, as Elyria Medical Center was not the closest hospital. When he arrived, Cannon was being treated in one of the emergency rooms and he was able to speak with him. Cannon told Officer Payne that he had been drinking at a bar in Lorain when several unknown males attempted to rob him. He indicated that one of the men had shot him and a good Samaritan had driven him to the hospital. A security guard was present when Cannon arrived and was able to provide Officer Payne with a description of the vehicle that had brought Cannon to the hospital. The officer then advised law enforcement to be on the lookout for that vehicle.

{¶23} Detective Buddy Sivert also responded to Elyria Medical Center and spoke with the security guard and Cannon. He learned from the security guard that one male had dropped off Cannon at the drive-up entrance to the emergency room. He then spoke with Cannon, who repeated his claim that he had been shot at a bar in Lorain when two men tried to rob him. Cannon indicated that he was not sure who had brought him to the hospital, and he specifically denied that he had been shot at D.B.'s apartment. In addition to taking Cannon's statement, Detective Sivert

tried to take pictures of Cannon's face. He testified that Cannon refused to open his eyes, however, and kept turning his head slightly to the side.

{¶24} The State introduced evidence that Cannon was transferred to Cleveland Medical Center for additional treatment at 5:01 a.m. and left against medical advice at 9:15 a.m. Detective Kurt Graupmann testified that, by the time the police secured a warrant for Cannon's arrest, he had already left the hospital. The detective spoke with Cannon's mother and sister several times in an effort to locate him, but they changed their stories each time he spoke with them. In fact, Cannon's mother denied knowing anything about Cannon leaving the hospital until the detective confronted her with a surveillance video, showing that she was the one who picked him up. The detective testified that Cannon managed to elude the police for almost four weeks, at which point they received a tip that he was staying at an apartment in Kent. Members of the fugitive task force then found Cannon inside the apartment, hiding beneath a pile of clothes, and arrested him.

{¶25} A DNA analyst from the Bureau of Criminal Identification ("BCI") testified that the police asked him to test four blood samples they collected from D.B.'s apartment, the stairwell, and the parking lot. He initially tested the samples without a standard for comparison and concluded that all four swabs contained the same male profile. Once the police obtained Cannon's DNA, the analyst performed additional testing using Cannon's standard. He then was able to determine that Cannon could not be excluded as the source of the male profile he uncovered on the blood samples taken from D.B.'s apartment and the surrounding area.

{¶26} Detective Christopher Kovach testified that, the same day as the shooting, the Cleveland Police Department recovered the vehicle that had brought Cannon to Elyria Medical Center. The vehicle was "engulfed in flames" when the Cleveland Police found it and investigators determined that the fire had been set intentionally. Detective Kovach testified that the police were

able to trace the car to an Enterprise Rental. The manager from that branch testified that Cannon had rented a car about three weeks before the shooting and, in that three-week period, had made two vehicle exchanges. The vehicle that was destroyed on the day of the shooting was the third vehicle Cannon had received from the company.

{¶27} Detective Kovach testified that the police only recovered one handgun inside D.B.'s apartment. That handgun was a .40 caliber semi-automatic, and it was found at D.B.'s feet when officers arrived on scene. The police found a total of eleven casings inside the apartment and, among those eleven casings, three different bullet brands. Detective Kovach specified that the police found (1) seven .45 caliber Hornady brand casings, (2) three .40 caliber Winchester casings, and (3) one .40 caliber Federal brand casing. The Federal brand casing was discovered just behind the couch in the living room, and the three Winchester casings were discovered inside D.B.'s bedroom. Meanwhile, one Hornady casing was found in the living room, and the remaining six were found on the floor of a back bedroom that D.B. used as a music studio. Detective Kovach testified that it was impossible to determine the order in which the bullets had been fired. Yet, the police were able to determine that three shots had been fired from D.B.'s bedroom (the Winchesters), seven had been fired from the music studio room and/or hallway outside D.B.'s bedroom (the Hornadys), and one had been fired in the living room (the Federal). Detective Kovach indicated that he was ultimately able to account for ten of those bullets, as there was evidence that they had either struck D.B. or were lodged in walls, floors, or other areas of the apartment. Though he could not account for the eleventh bullet that had been fired, there was testimony that the police were never able to test the bullet that lodged itself in Cannon's right arm.

{¶28} A firearms analyst from BCI tested the bullets, bullet fragments, and casings recovered from the scene. He testified that all three Winchester rounds had been fired from the

handgun found at D.B.'s feet. Because no additional handguns were recovered, he was unable to match either the Hornaday rounds or the Federal round to a specific firearm. Nevertheless, he testified that all seven Hornady rounds had been fired from the same handgun. He also was able to testify that the Federal round had been fired from a different handgun; most likely a .40 caliber Smith & Wesson Sigma series handgun. The analyst confirmed that the testing he performed supported the conclusion that three different firearms had been fired in the apartment at the time of the shooting.

{¶29} Viewing all of the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved, beyond a reasonable doubt, that Cannon either perpetrated the offenses herein or aided and abetted another in perpetrating those offenses. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State produced evidence that two men broke into D.B.'s apartment, one of those men was shot before he fled, and that man was Cannon. The twin brother testified that he saw both intruders run from the back of the apartment where D.B. was located, and the evidence showed that three handguns were fired that evening: D.B.'s handgun and two others. The jury, therefore, reasonably could have concluded that Cannon brought a gun with him to the apartment, fired it at least once during the affray, and took it with him when he fled. Moreover, the jury reasonably could have concluded that his actions demonstrated a consciousness of guilt. Cannon was not forthcoming about the events that transpired and attempted to evade apprehension. There was testimony that he repeatedly lied about having been shot elsewhere, left the hospital against medical advice, concealed his whereabouts for almost four weeks, and attempted to hide in a pile of clothing when the police finally came to arrest him. *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 167 (flight and concealment are evidence of consciousness of guilt); *State v. Thomas*, 9th Dist. Summit No. 27435, 2015-Ohio-

2379, ¶ 14 ("[L]ying tends to show consciousness of guilt."). Even if Cannon did not act as the principal herein, the State produced a wealth of evidence tending to show that he shared the principal's criminal intent and actively supported or assisted the principal in the commission of his crimes. *See Johnson*, 93 Ohio St.3d 240 at syllabus; *see also Lollis*, 2014-Ohio-684, at ¶ 21, quoting *Scott*, 61 Ohio St.2d at 165. We, therefore, cannot conclude that his convictions are based on insufficient evidence. Cannon's first and third assignments of error are overruled.

### Assignment of Error II

**The conviction of [Cannon] is against the manifest weight of the evidence such that reversal is required consistent with substantive and procedural due process and the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 5, 9, and 16 and Article IV, Section 3(B)(3) of the Ohio Constitution.**

{¶30} In his second assignment of error, Cannon argues that his convictions are against the manifest weight of the evidence. He argues that the greater weight of the evidence showed that he was merely present in D.B.'s apartment when the shooting occurred. Because the jury lost its way when it was persuaded by the State's evidence, Cannon argues, his convictions must be reversed. We disagree.

{¶31} When considering an argument that a criminal conviction is against the manifest weight standard, this Court is required to

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson*, 9th Dist. Summit, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction[,]" *Thompkins*, 78 Ohio St.3d at 387.

{¶32} Cannon testified in his own defense. He acknowledged that he was at D.B.'s apartment when the shooting occurred, but claimed that he was invited there to transact a drug deal. According to Cannon, he brought three men with him to the apartment complex: (1) his associate, A.P.; (2) C.H., who was a frequent customer of A.P.; and (3) R.B., who was an acquaintance of C.H. Cannon testified that he had two ounces of heroin to sell to the twins, both of whom C.H. had vouched for in advance. According to Cannon, after he parked his vehicle, he and C.H. went to meet the twins inside the apartment while A.P. and R.B. remained outside with the heroin. He claimed that he, C.H., and the twins were discussing business when A.P. and R.B. unexpectedly kicked through the door and began firing shots. Cannon testified that he and C.H. dropped to the ground and, when the shots momentarily stopped, he ran for the door.

{¶33} Cannon testified that C.H. made it out of the door first and, just before he (Cannon) made it out, someone shot him. He stated the he kept moving, but slowed down as he grew dizzy. As he slowed, A.P. and R.B. came down the stairwell, rushed past him, and ran out of the apartment complex before he did. Cannon then made his way outside and saw his vehicle backing out. According to Cannon, he was hesitant to get inside the vehicle because, at that point, he was not sure who had shot him. Nevertheless, he decided to get inside when A.P. swung open the back door and motioned for him to climb in. The group then sped away from the apartment complex.

{¶34} Cannon testified that, at some point, C.H. and R.B. got out of the vehicle and A.P. drove him to an emergency room. Cannon conceded that he lied to the nurse and several police officers when they questioned him at the hospital, but testified that he only lied because he was afraid that they would detain him and would not believe that he was not involved with the shooting. Cannon claimed that he never carried a gun, as he had a prior conviction and did not want to incur

a charge for having a weapon under disability. He further claimed that he was unaware that A.P. and R.B. had guns or that they planned to rob the twins.

{¶35} As noted, one of the State's witnesses was D.B.'s neighbor, a man who testified that he saw two men running through the parking lot as he was calling 911. During its case-in-chief, the defense called the man's girlfriend as a witness. Much like her boyfriend, she testified that she was asleep when gunshots rang out and startled her. She indicated that the incident happened extremely fast and, within seconds, she, her boyfriend, and their children were startled from sleep, her boyfriend placed a call to 911, and she looked out the apartment's window. Unlike her boyfriend, the girlfriend recalled seeing three men running through the parking lot. She testified that two of the men ran toward a vehicle and the third ran around the smaller building that housed the dumpster. She readily admitted on cross-examination, however, that she only saw the men in the parking lot. As such, it was not her testimony that she saw three men emerge from D.B.'s apartment.

{¶36} Having reviewed the record, we cannot conclude that the jury clearly lost its way when it found that Cannon either perpetrated the offenses herein or aided and abetted another in perpetrating those offenses. *See Otten*, 33 Ohio App.3d at 340. Cannon's testimony that two men broke into D.B.'s apartment while he and C.H. were already inside directly contradicted the twin brother's testimony that his brother was in his bedroom and he was asleep when the break-in occurred. His testimony also contradicted the physical evidence, as it showed that D.B. was shot and killed in his bedroom, clothed only in a pair of boxer shorts. The jury heard testimony that Cannon repeatedly lied about his involvement in the shooting and evaded apprehension for almost four weeks. The jury, therefore, could have chosen to believe the State's witnesses and disregarded Cannon's version of the events. *See State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-

3296, ¶ 15 ("This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly.") "A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Upon review, Cannon has not shown that this is the exceptional case where the jury lost its way by convicting him. *See Otten* at 340. Accordingly, his second assignment of error is overruled.

## III.

**{¶37}** Cannon's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CALLAHAN, P. J.
CARR, J.
CONCUR.

APPEARANCES:

GREGORY SCOTT ROBEY, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.