[Cite as *State v. Tyler*, 2019-Ohio-4661.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.     29225 |
|---|---|
|      Appellee | |
|      v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| QUEITIN T. TYLER | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
|      Appellant | CASE No.     CR 2017 11 4077B |

DECISION AND JOURNAL ENTRY

Dated: November 13, 2019

SCHAFER, Judge.

{¶1} Defendant-Appellant, Queitin Tyler, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Late one evening, two men were shot outside a bar in Akron. The first man, D.H., sustained a fatal wound and collapsed in a parking lot just south of the bar. The second man, D.C., sustained a non-fatal wound and managed to run several blocks on foot. The police intercepted D.C. as they responded to the area and learned that the shooting had occurred at a nearby bar.

{¶3} Once the police identified the bar where the shooting had occurred, they obtained its security footage. The footage helped them pinpoint a suspect as well as four individuals who appeared to be his friends. All of their identities were unclear, however, so the police used the security footage to create still shots of each person. While withholding the still of the suspect,

they then published the remaining stills and asked those individuals to come forward. All four individuals responded within two days, and officers interviewed them at the station. As a result of those interviews and additional investigation, the police identified Tyler as the shooter.

{¶4} Tyler was indicted for murder, felony murder, two counts of felonious assault, illegally possessing a firearm in a liquor permit premises, carrying a concealed weapon, and four attendant firearm specifications. He filed several pretrial motions, including two motions to suppress, and the court held hearings on his motions. After the court denied his motions, the matter proceeded to trial.

{¶5} The State ultimately dismissed Tyler's illegal possession count, and a jury found him guilty of his remaining counts and specifications. The court merged his felony murder count, one of his felonious assault counts, and the specifications linked to those counts with his count for murder and its attendant specification. It then sentenced him on each of his remaining counts and specifications and ordered several of those terms to run consecutively for a total of 23 years to life in prison.

{¶6} Tyler now appeals from his convictions and raises six assignments of error for our review. For ease of analysis, we reorder several of the assignments of error.

II.

## Assignment of Error I

**Failing to suppress identifications and cell photo date[.] (Sic.)**

{¶7} In his first assignment of error, Tyler argues that the trial court erred when it denied his motions to suppress. Specifically, he argues that the court ought to have suppressed: (1) several witness identifications; and (2) any ownership records, call records, or cell-site

records that the police obtained from his cell phone provider. We do not agree that the court erred when it denied Tyler's motions.

{¶8} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Accordingly, an appellate court must accept a trial court's findings of fact when they are supported by competent, credible evidence. *Id.* However, accepting those facts as true, the appellate court must independently determine, without deference to the trial court's conclusion, whether those facts satisfy the applicable legal standard. *Burnside* at ¶ 8.

Witness Identifications

{¶9} "Determining the admissibility of identification testimony is a two-step process." *State v. Reed*, 9th Dist. Wayne No. 12CA0051, 2013-Ohio-3970, ¶ 43. First, a court must consider "whether the identification procedure was unnecessarily suggestive." *State v. Turner*, 9th Dist. Summit No. 28775, 2018-Ohio-3898, ¶ 10. If so, it then must consider "whether the identification was ultimately unreliable under [] all of the circumstances." *Id.*

{¶10} The shooting herein took place just outside of a bar in Akron. The trial court found that the police spoke with witnesses at the scene and ultimately obtained security footage from several cameras at the bar. Upon review of the footage, the police were able to pinpoint the suspected shooter, as well as four individuals they believed to be his friends. They were unable to identify the suspect or his friends by name, however, so they used the security footage to create stills of their faces. The police then released the stills of the four friends and asked them

to come forward. Three of those individuals contacted the police the following day, and the fourth spoke with them the day after that.

{¶11} The trial court found that the police showed all four individuals the still of the man believed to be the shooter and asked them to identify him by name. "After some prodding," each of the individuals admitted they knew the man and provided the police with one or more of his nicknames. Eventually, they also provided the police with his real name, Queitin Tyler. The court found that two of the individuals had known Tyler since childhood, the third knew him well, and the fourth knew him as an acquaintance. The court found that their familiarity with him "greatly reduce[d] the chances of a police-induced improper identification," as did the fact that they were with Tyler immediately before and after the incident. Further, the court noted that the police were not asking the individuals to identify Tyler as the shooter. Instead, the police "already knew who [the] shooter was" and were only asking the individuals for Tyler's name. The court concluded, based on the totality of the circumstances, that the police did not employ an unnecessarily suggestive identification procedure in violation of Tyler's constitutional rights. Accordingly, it denied his motion to suppress.

{¶12} Tyler argues that the trial court erred when it denied his motion to suppress because the police employed an unduly suggestive identification procedure. He claims the procedure was suggestive because the police did not create an array and ask the four individuals if they recognized him. Instead, the police "had [already] made up their minds that the hooded man [in the security video] was 'the shooter.'" Because the police drew that conclusion themselves and only showed the individuals his picture, he argues that the procedure they employed was unnecessarily suggestive.

{¶13} This Court finds Tyler's argument to be misguided. A suggestive identification procedure is one that suggests to a victim or eyewitness that a specific person is the perpetrator. The law guards against suggestive procedures due to the inherent danger they will result in an unreliable identification, i.e., one that misidentifies the perpetrator due to the state's action. *See Neil v. Biggers*, 409 U.S. 188, 196-198 (1972). There was no such danger in this case because the police never asked the four individuals with whom they spoke to identify Tyler *as the shooter*. At that point, the police had already reviewed the security footage and had identified the shooter by sight. The only information they required was his name. They, therefore, presented the individuals with a picture of the shooter to learn his name, not for the sake of identifying him as the shooter. Because the police never employed an unnecessarily suggestive procedure to identify Tyler as the shooter, the trial court properly denied that portion of his motion to suppress. *See generally State v. Nelson*, 10th Dist. Franklin No. 82AP-797, 1983 WL 3493, *2-3 (May 5, 1983). *See also State v. Huff*, 145 Ohio App.3d 555, 564-565 (1st Dist.2001).

Cell Phone Records

{¶14} The Fourth Amendment protects individuals from unreasonable searches and seizures by the government. *Accord* Article I, Section 14, Ohio Constitution. "The exclusionary rule is a judicially created remedy for Fourth Amendment violations." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 92. It "serves to protect Fourth Amendment rights through its deterrent effect rather than creating a personal constitutional right * * *." *State v. Scott*, 9th Dist. Lorain Nos. 15CA010844, 15CA010846, 2017-Ohio-358, ¶ 12. Thus, the question of "[w]hether the exclusionary rule's remedy of suppression is appropriate in a particular context is a separate analysis from whether there has been a Fourth Amendment violation." *State v. Hoffman*, 141

Ohio St.3d 428, 2014-Ohio-4795, ¶ 24. Suppression is appropriate only if it "will create a sufficient deterrent effect to prevent future violations of the Fourth Amendment and Article I, Section 14 [of the Ohio Constitution]." *Id.* at ¶ 26. *See also Castagnola* at ¶ 96 ("The purpose of the exclusionary rule is to deter police misconduct."). "The rationale behind the rule is served 'only if the prosecution is put in the same, but not worse, position [than] had the misconduct not occurred.'" *State v. Gedeon*, 9th Dist. Summit No. 29153, 2019-Ohio-3348, ¶ 37, quoting *State v. Perkins*, 18 Ohio St.3d 193, 194 (1985).

{¶15} The trial court found that, following Tyler's arrest, the police obtained a court order for his "historical call detail records with cell site and sector information * * *." The court found that the police had "routinely, for many years, obtained cell phone and cell-site records through the use of court-ordered subpoenas" rather than search warrants. After they received Tyler's cell phone records from his provider, however, the United States Supreme Court issued *Carpenter v. United States*, 585 U.S. ___, 138 S.Ct. 2206 (2018). *Carpenter* held "that the Government must generally obtain a warrant supported by probable cause before acquiring [cell-site] records." *Carpenter* at 2221. In light of that decision, the police secured a search warrant for Tyler's cell phone records and, pursuant to the warrant, obtained the same records from his provider.

{¶16} Tyler moved to suppress his cell phone records on the basis that the police obtained them without a warrant. He acknowledged that the police later secured a warrant and used it to obtain another copy of the records. Even so, he argued that their subsequent efforts did not cure the constitutional violation that had occurred when they initially obtained his records.

{¶17} The trial court found that, under *Carpenter*, the police conducted a search when they initially requested Tyler's cell-site records. Because that search was not supported by a

warrant, the court determined that a constitutional violation occurred. Nevertheless, it found that officers had acted in good faith when they secured the records by court order, as that had been their long-standing procedure and *Carpenter* represented a change in the law. It further found that the State rectified the constitutional violation that had occurred when, following *Carpenter's* issuance, officers immediately secured a warrant and used it to obtain another copy of Tyler's records. The court concluded that the second set of records were properly obtained and the rationale behind the exclusionary rule would not be served if it were to suppress those records. Consequently, it denied Tyler's motion to suppress.

{¶18} Tyler argues that the court ought to have suppressed his cell phone records because it was unreasonable for the police to secure them by court order. He notes that in *Riley v. California*, 573 U.S. 373 (2014), the United States Supreme Court "clearly established that police may not, without a warrant, search digital information on a cell phone seized on arrest." According to Tyler, the police failed to act in good faith when they ignored that clearly established precedent. Further, he claims that the good faith exception only applies when the police rely upon a defective warrant, not when they altogether fail to obtain one. Because the police obtained his records without a warrant, he argues that the records were subject to the exclusionary rule.

{¶19} Tyler has not challenged any of the trial court's factual findings, and, upon review, the record contains competent credible evidence in support of those findings. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. Detective Kennedy testified that his department initially obtained Tyler's cell phone records via court order and subpoena, the method it had routinely employed for at least 17 years. Several months after they received his records, *Carpenter* issued. The detective testified that, as a result of *Carpenter*, the department

secured a warrant and obtained the same records from Tyler's cell phone provider. Because the detective's testimony constitutes competent, credible evidence in support of the trial court's findings, we accept those findings true and consider its legal conclusion in light of those findings. *See id.*

{¶20} Upon review, we cannot conclude that the trial court erred when it refused to suppress Tyler's cell-site records. The exclusionary rule is a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Because its purpose is to deter police misconduct, it does not apply when the police secure evidence "in reasonable reliance on binding precedent," *Davis v. United States*, 564 U.S. 229, 241 (2011), or "as a result of nonculpable, innocent [] conduct," *id.* at 240. Before *Carpenter*, Detective Kennedy and his department had been securing cell phone records by way of court order and subpoena for more than 17 years without incident. While Tyler claims that, in doing so recently, they ignored the Supreme Court's directive in *Riley*, that case only concerned cell phone searches conducted incident to a lawful arrest. *See Riley*, 573 U.S. at 382. The search at issue here did not occur incident to a lawful arrest; it occurred when the police sought records from Tyler's provider. Tyler has not explained how manual searches of an arrestee's cell phone incident to a lawful arrest are tantamount to post-arrest requests for business records maintained by an arrestee's cell phone provider. *See* App.R. 16(A)(7). Because he has not shown that the police ignored Supreme Court precedent when they initially requested his provider records, we reject his argument.

{¶21} Even assuming that the first search the police conducted herein was not the "result of nonculpable, innocent [] conduct," *Davis* at 240, it is undisputed that the police conducted a second search pursuant to a warrant. That search produced identical information to the first search, and Tyler never challenged the warrant underlying the second search. Nor did he allege

that the police secured the second warrant based upon any information they learned as a result of the first search. Because the results of the second search did not flow from the earlier constitutional violation that occurred, the exclusionary rule did not apply to the results of that search. *See State v. Graves*, 9th Dist. Medina No. 13CA0068-M, 2014-Ohio-5477, ¶ 12, quoting *State v. Hobbs*, 9th Dist. Summit No. 25379, 2011-Ohio-3192, ¶ 18. Suppressing those results would have placed the State in a worse position than had any misconduct not occurred. *See Gedeon*, 2019-Ohio-3348, at ¶ 37, quoting *Perkins*, 18 Ohio St.3d at 194. Further, it would not have served the exclusionary rule's underlying rationale of deterrence, as the record reflects that the police worked quickly to comply with the Supreme Court's directive in *Carpenter* once the case issued. *See Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, at ¶ 96. Under these facts and circumstances, we cannot conclude that the trial court erred when it denied Tyler's motion to suppress. Accordingly, Tyler's first assignment of error is overruled.

### Assignment of Error II

**Allowing expert testimony to usurp jury's role[.] (Sic.)**

{¶22} In his second assignment of error, Tyler argues that the trial court erred when it permitted Detective Michael Klein to testify as an expert witness. For the following reasons, we reject Tyler's assignment of error.

{¶23} Admissibility determinations under the evidentiary rules generally fall within the sound discretion of the trial court. *See State v. Campbell*, 9th Dist. Summit No. 24668, 2010-Ohio-2573, ¶ 26. Accordingly, we will review them for an abuse of discretion and uphold them so long as the court's attitude was not unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "If a defendant fails to object to the admission of [evidence], however, [he] forfeits all but plain error on appeal." *State v. Marshall*, 9th Dist.

Medina No. 18CA0054-M, 2019-Ohio-1154, ¶ 20. Likewise, the "withdrawal of [an] objection constitutes a forfeiture" and limits our review to that of plain error. *State v. Price*, 9th Dist. Medina No. 14CA0070-M, 2015-Ohio-5043, ¶ 9. *Accord State v. Scherban*, 9th Dist. Medina No. 2461-M, 1996 WL 285371, *1 (May 29, 1996). Plain error exists only where there is a deviation from a legal rule, that is obvious, and that affected the appellant's substantial rights to the extent that it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶24} Detective Klein, an expert in forensic video image analysis, reviewed the security footage from the bar where the shooting occurred. Observing that the suspected shooter appeared to have multiple tattoos, he extracted images of the man's arms and hands using the programs and techniques he had learned in his years of training. After doing so, he obtained pictures of Tyler's arms and hands and placed them alongside the extracted images. His side-by-side comparisons of the pictures and extracted images ultimately led him to draw a conclusion about the identity of the suspected shooter.

{¶25} Tyler filed a pretrial motion in limine, seeking to exclude Detective Klein's testimony. He argued that the detective's conclusion was inadmissible because it fell below the standard of reasonable scientific certainty and did not relate to a matter beyond the jury's knowledge. Tyler claimed that the average juror would be able to compare two sets of images and form a conclusion as to whether they looked alike. Thus, he asked the court to exclude Detective Klein's testimony.

{¶26} At the start of trial, the lower court indicated that a discussion about Detective Klein's testimony had taken place in chambers. The court noted that it had taken the matter under advisement and would "probably have an individual voir dire of the [detective] prior to his testimony." Directly before the detective was to testify, however, the prosecutor notified the

court that the parties had spoken, the defense had been shown the exhibits the State intended to introduce through the detective, and the State was prepared to limit his testimony "to the technical aspects of what he does * * *." The prosecutor clarified that he would not ask the detective his opinion, but would allow the jury to form its own conclusion based on his work product. The following exchange then took place:

> THE COURT: I think I understand that you're going to ask him * * * what is being shown, but he's not going to opine on the ultimate question of whether those hands or arms are those of the defendant?

> [THE PROSECUTOR]: Right. The farthest the State will go is explaining --

> THE COURT: Argue that in closing based on the evidence, but not based on Detective Klein's opinion?

> [THE PROSECUTOR]: Correct. I will ask him why he chose particular images, but nothing more than that.

> THE COURT: All right. [Defense counsel].

> [DEFENSE COUNSEL]: I think that's what our client was -- I think the State ought to say I was right and that they agree.

> THE COURT: I don't know. I don't know if you're going to get that concession.

> [DEFENSE COUNSEL]: Thank you. Thank you very much.

> THE COURT: All right. They just don't want to give you a win, so they're going to concede it.

Following that discussion, Detective Klein took the stand and testified without objection.

{¶27} Tyler argues that the trial court erred when it permitted Detective Klein to testify. He claims that the detective "plainly usurped the jury's function" and that his demonstrative exhibits "were clearly directed to answer 'the ultimate question'" of whether he (Tyler) was the shooter. Tyler's argument is not properly before us, however, as he failed to preserve it for review. Although Tyler initially moved to exclude the detective's testimony, the record reflects that he withdrew his objection once the State agreed to limit its examination. That withdrawal

resulted in a forfeiture of Tyler's objection and extinguished all but a claim of plain error. *See Price*, 2015-Ohio-5043, at ¶ 9; *Scherban*, 1996 WL 285371, at *1. Because Tyler has not argued plain error on appeal, this Court will not construct a plain error argument on his behalf. *See Marshall*, 2019-Ohio-1154, at ¶ 20. Accordingly, Tyler's second assignment of error is overruled.

### Assignment of Error III

**Failing to dismiss for insufficient evidence at the close of the State's case[.] (Sic.)**

{¶28} In his third assignment of error, Tyler argues that his murder conviction and one of his felonious assault convictions are based on insufficient evidence. Specifically, he argues that the State failed to prove, in its case-in-chief, that he was the shooter or that he possessed the requisite mens rea for either offense. Upon review, we reject Tyler's argument.

{¶29} This Court reviews the denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence. *State v. Smith*, 9th Dist. Summit No. 27389, 2015-Ohio-2842, ¶ 17, quoting *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Although we conduct de novo review when considering a sufficiency of the evidence challenge, "we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570, C-120751, 2013-Ohio-4775, ¶ 33.

{¶30} A person commits murder if he "purposely cause[s] the death of another * * *." R.C. 2903.02(A). A felonious assault occurs if a person "knowingly * * * [c]ause[s] or attempt[s] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). "A person acts purposely when it is [his] specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what [he] intends to accomplish thereby, it is [his] specific intention to engage in conduct of that nature." R.C. 2901.22(A). "A person acts knowingly, regardless of purpose, when [he] is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶31} As with any other element, "[t]he identity of a perpetrator must be proved by the State beyond a reasonable doubt." *State v. Moorer*, 9th Dist. Summit No. 27685, 2016-Ohio-7679, ¶ 24. "[I]dentity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9.

{¶32} J.R. was working security detail at the bar on the evening of the shooting. He testified that he was primarily stationed at the bar's main entrance where patrons had to submit to a frisk before they were allowed inside. J.R. recalled that he initially denied a man entry that evening because the man was carrying a liquor bottle. Once the man discarded the bottle and returned, J.R. patted him down and admitted him. He testified that the man came back outside later that evening.

{¶33} J.R. stated that, when the man came back outside, he walked up to two men, one of whom was tall and one of whom was short. He then asked the two men if he could purchase a cigarette from them and a confrontation ensued. According to J.R., the taller man responded

disrespectfully and began mocking the man who had been carrying the liquor bottle. He estimated that the taller man spent 30 to 45 seconds engaging in "a one-sided [verbal] onslaught" while the man who had been carrying the liquor bottle listened. The man who had been carrying the liquor bottle then went back inside, giving J.R. the impression that he had chosen to walk away and be "the bigger man." A short time later, however, J.R. saw a revolver emerge from the main entrance doorway and a muzzle flash. He did not see the shooter and, for several minutes, he did not realize anyone had been shot. Someone then began yelling that there was a body in the parking lot and chaos ensued. When shown a photograph of one of the victims, J.R. confirmed that it was the tall man who had ridiculed the man with the liquor bottle. Although the tall man had been disrespectful that evening, J.R. confirmed that he never saw the man display a weapon or otherwise threaten the man with the liquor bottle.

{¶34} As part of his duties with the crime scene unit, Detective Daniel Gump collected the security footage from the bar where the shooting occurred. He later reviewed the footage and pinpointed the man who appeared to be the shooter. Because the bar had numerous cameras and each camera angle had recorded on a separate feed, Detective Gump then created a composite video. The composite video focused on the man believed to be the shooter and followed his movements across multiple feeds as he walked around inside and outside the bar that evening.

{¶35} As part of its case-in-chief, the State played the composite video that Detective Gump created. The video centers around a man in a hat and hooded sweatshirt. When shown a clip from the video, J.R. confirmed that the man in the hat and the hooded sweatshirt was the man with the liquor bottle. The video depicts the man entering the bar, mingling, and going back outside within twenty minutes. The man remains outside for less than two minutes, during which time he can be seen interacting with two men in the distance. The man in the hat and

hooded sweatshirt then reenters the bar and walks over to a group of people on the dance floor. The man speaks with the group for less than two minutes, during which time one of the females in the group retrieves her purse and brings it over to him. The man then walks back outside, at which point he is walking away from the camera. As the man breeches the doorway of the main entrance and that camera angle loses sight of him, he removes his left hand from his sweatshirt pocket and raises his left arm. At virtually that same moment, a different camera angle captures the people outside startle and the two men in the distance duck and run. The man in the hat and hooded sweatshirt then reenters the bar and sticks something in his left, sweatshirt pocket.

{¶36} The State called several witnesses for the purpose of identifying Tyler as the man in the hat and hooded sweatshirt. Detective Kennedy testified that the police located four individuals who interacted with the man that evening and appeared to be his friends. Those individuals were interviewed, and the detective testified that they ultimately identified Tyler, either by name or nickname, as the man in the hat and hooded sweatshirt. Two of those individuals testified at trial and grudgingly admitted that Tyler was at the bar the night of the shooting. When interviewing one of those individuals, Detective Kennedy specifically asked her whether she had carried a gun in her purse and had given it to Tyler. The woman claimed that she did not recall bringing a gun to the bar. Instead, she told the detective that Tyler had said "he got the gun from his bro * * *."

{¶37} Detective Klein, an expert in forensic video image analysis, reviewed the security footage from the bar in the hopes of uncovering additional information about the suspected shooter. The detective testified that tattoos are excellent identifiers and the police provided him with photographs of the tattoos Tyler had on his hands and arms. After the detective reviewed the security footage, he extracted several images of the suspect's hands and arms. In doing so,

he used his training and certain applications to isolate the best frames from a series of images, taking care to retain as much ridge detail as possible and to limit the amount of distortion that can occur when images are enlarged. He then placed the extracted images side-by-side with the photographs of Tyler's hands and arms and drew lines between points of comparison. For example, one of the exhibits he created showed (1) a tattoo on the top, outermost edge of Tyler's left hand; (2) a dark area of the same size on the top, outermost edge of the suspect's left hand; and (3) lines connecting the related areas on the two sets of images.

{¶38} Sergeant Scott Lietke conducted Tyler's initial interview at the police station. He testified that Tyler denied being at the bar on the evening of the shooting. Instead, Tyler claimed he was at home with his girlfriend. The police obtained Tyler's cell phone records, however, and the records showed that his phone was in the vicinity of the bar at the time of the shooting. The records showed that his phone only traveled northbound, in the direction of his home, after the shooting.

{¶39} Detective Kennedy also interviewed Tyler at the police station and confirmed that Tyler was left-handed like the suspected shooter. He noted that, on the composite security video, the pocket of Tyler's sweatshirt appeared to sag on the left-hand side as he exited the bar immediately before the shooting. The detective testified that a weapon has weight to it and can cause clothing to sag when concealed inside.

{¶40} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved, beyond a reasonable doubt, the element of identity and the elements of murder and felonious assault. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State set forth evidence that Tyler went to the bar on the evening of the shooting and had a confrontation with the victims. Although none of the bar's cameras captured

the shooter at the exact moment of the shooting, the State set forth a wealth of circumstantial evidence tending to show that Tyler was the shooter. *See Taylor*, 2015-Ohio-403, at ¶ 9. The shooting occurred within minutes of his confrontation with the victims, and there was evidence that, during those few minutes, he obtained a gun from either one of his female friends or his "bro." The composite security video showed Tyler walking outside, removing his hand from his left pocket, and raising his left arm directly before shots rang out and people scattered. Further, it showed Tyler reentering the bar moments after the shooting and sticking something back in his left pocket. Upon review, the jury reasonably could have concluded that Tyler shot both victims as a result of the confrontation that had taken place a few minutes earlier. Tyler has not shown that his convictions for murder and felonious assault are based on insufficient evidence. Thus, his third assignment of error is overruled.

### Assignment of Error V

**The convictions are against the manifest weight of the credible evidence.**

{¶41} In his fifth assignment of error, Tyler argues that his convictions are against the manifest weight of the evidence. We do not agree.

{¶42} When considering an argument that a criminal conviction is against the manifest weight standard, this Court is required to

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson*, 9th Dist. Summit

No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340, where the evidence "weighs heavily against the conviction," *Thompkins*, 78 Ohio St.3d at 387.

{¶43} Tyler testified in his own defense. Though he acknowledged that he was the man who shot the two victims, he claimed that he only fired a gun in their direction as an act of self-defense. Tyler stated that he went to the bar that evening with a few friends and, at some point, tried to purchase a cigarette from the victims. Tyler indicated that the taller victim then began harassing him and ultimately threatened to kill him, flashing a pistol that was tucked into his waistband. At that point, Tyler went back inside. He claimed that he did not speak with any of the security guards or otherwise seek help because he was afraid and just wanted to leave. Because the victims were stationed at the bar's only exit, Tyler decided to borrow a gun from his male friend and flash the gun at the victims as he left. As soon as he went to walk back outside, however, he heard two gunshots from his right and returned fire twice in that direction to protect himself.

{¶44} Tyler acknowledged that he initially lied to the police about not being at the bar and about not knowing the individuals he was there with that evening. He further acknowledged that, before testifying at trial, he never mentioned having shot the victims in self-defense. Tyler repeatedly indicated that he was dishonest with the police because he did not trust them. It was his testimony that he wanted to wait until he was before a jury to tell his side of the story.

{¶45} Tyler argues that the jury lost its way when it rejected his claim of self-defense. He argues that Detective Kennedy was not a credible witness because his testimony largely relied on hearsay and his own interpretation of what happened that evening. Tyler also argues that the jury should have inferred, based on the surviving victim's failure to testify, that his testimony would not have favored the State. Tyler notes that the police found a loaded handgun

nearby the body of D.H., the victim who died. He argues that the weight of the evidence supports the conclusion that he was threatened and only shot at the victims in self-defense.

{¶46} Because former R.C. 2901.05(A) applied at the time of trial, it was Tyler's burden to prove, by a preponderance of the evidence, that he acted in self-defense. To establish self-defense, he had to prove "that [he] was not at fault in creating the situation giving rise to the affray; (2) that [he] had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that [he] did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Having reviewed the record, we cannot conclude that the jury lost its way when it rejected Tyler's claim of self-defense.

{¶47} Although the police found a handgun near D.H.'s body, J.R. witnessed Tyler's interaction with the two victims and testified that he never saw the victims display a weapon or otherwise threaten Tyler. He also testified that one person fired a gun from the doorway of the bar's main entrance, not that two different people fired guns. The jury heard testimony that Tyler repeatedly lied to the police and, prior to trial, never claimed to have acted in self-defense. *See State v. Thomas*, 9th Dist. Summit No. 27435, 2015-Ohio-2379, ¶ 14, citing *State v. Johnson*, 46 Ohio St.3d 96, 100 (1989) ("The Ohio Supreme Court has recognized that lying tends to show consciousness of guilt."). Further, the jury saw the security video in which Tyler removed his left hand from his sweatshirt pocket and raised his left arm as he was breeching the doorway of the bar's main entrance. The jury reasonably could have found that Tyler's dishonesty and the video negated his claim of self-defense.

{¶48} As the trier of fact, the jury was in the best position to evaluate the credibility of the witnesses and was "'free to believe all, part, or none of the testimony of each witness.'"

*State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. A verdict is not against the manifest weight of the evidence simply "because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Upon review, Tyler has not shown that this is the exceptional case where the evidence weighs heavily against his convictions. *See Otten*, 33 Ohio App.3d at 340. As such, his fifth assignment of error is overruled.

## Assignment of Error IV

**Errors in jury instructions[.] (Sic.)**

{¶49} In his fourth assignment of error, Tyler argues that the trial court erred when it instructed the jury. Specifically, he challenges the court's instructions on consciousness of guilt and transferred intent. For the following reasons, we reject Tyler's argument.

{¶50} In general, "[t]his Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68. An abuse of discretion implies the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219. If a defendant fails to object to a jury instruction, however, the plain error standard applies. *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 20. Plain error exists only where there is a deviation from a legal rule, that is obvious, and that affected the appellant's substantial rights to the extent that it affected the outcome of the trial. *Barnes*, 94 Ohio St.3d at 27. Under either scenario, an appellate court must "review[] the instructions as a whole." *State v. Schell*, 9th Dist. Summit No. 28255, 2017-Ohio-2641, ¶ 38. "'If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at

trial, reversible error will not be found merely on the possibility that the jury may have been misled.'" *State v. Lollis*, 9th Dist. Summit No. 26607, 2014-Ohio-684, ¶ 35, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993).

Consciousness of Guilt

{¶51}  "[E]vidence of flight is admissible as it tends to show consciousness of guilt. * * * [A] jury instruction on flight is appropriate if there is sufficient evidence in the record to support the charge."  *State v. Villa*, 9th Dist. Lorain No. 05CA008773, 2006-Ohio-4529, ¶ 29.  In other words, "the record [must] contain[] evidence from which reasonable minds might reach the conclusion sought by the instruction.'"  *State v. Jackson*, 9th Dist. Lorain No. 11CA010012, 2012-Ohio-3524, ¶ 15, quoting *Feterle v. Huettner*, 28 Ohio St.2d 54, syllabus (1971).

{¶52}  Tyler argues that the State presented insufficient evidence to warrant a flight instruction.  He notes that both victims fled when he shot at them and he turned himself in shortly after a warrant issued for his arrest.  According to Tyler, there was no evidence that he knew anyone had been hurt before his warrant issued.  Because he never attempted to avoid apprehension, he argues that the court ought to have denied the State's request for the flight instruction.

{¶53}  Even assuming that the trial court erred by issuing a flight instruction, the record reflects that its error was harmless beyond a reasonable doubt.  *See State v. Boatright*, 9th Dist. Summit No. 28101, 2017-Ohio-5794, ¶ 37, citing *State v. Penix*, 9th Dist. Summit No. 23699, 2008-Ohio-1051, ¶ 29.  Tyler ultimately admitted that he shot at the victims, so the only question for the jury was whether he did so in self-defense.  The State set forth evidence that he left the bar before the police arrived, only came forward after the police issued a warrant for his arrest, and repeatedly lied to the police when they interviewed him.  *See Thomas*, 2015-Ohio-2379, at ¶

14, citing *Johnson*, 46 Ohio St.3d at 100 ("The Ohio Supreme Court has recognized that lying tends to show consciousness of guilt."). Moreover, the jury was able to view the security video, wherein Tyler could be seen interacting with the victims, reentering the bar, obtaining a gun, and returning to the parking lot to shoot the victims in a short period of time. Given the overwhelming evidence in support of his convictions, any error the trial court committed in issuing a flight instruction was harmless beyond a reasonable doubt. *See Boatright* at ¶ 37, citing *Penix* at ¶ 29. Accordingly, we reject Tyler's argument insofar as it concerns the court's instruction on consciousness of guilt.

Transferred Intent

{¶54} Tyler also challenges the trial court's jury instruction on transferred intent. The court's instruction reads as follows:

> As to [the murder, felony murder, and felonious assault] charges * * *, if you find the defendant *was attempting to cause* injury or death to [D.C.] and that his act or acts unintentionally or accidentally caused injury or death to [D.H.], then the defendant is as responsible as if his act or acts had injured or killed [D.C.]

(Emphasis added.) Tyler argues that the court's instruction was erroneous because he was never charged with attempted murder. Because the State had to prove that he intentionally caused D.C.'s death, he argues that the court's instruction "did not fit the circumstances of [the] case." Tyler acknowledges that he did not object to the court's instruction, so the plain error standard applies.

{¶55} The doctrine of transferred intent "stands for the proposition that 'the culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the actual victim.'" *State v. Stoddard*, 9th Dist. Summit No. 27426, 2015-Ohio-3750, ¶ 26, quoting *State v. Solomon*, 66 Ohio St.2d 214, 218

(1981). The Ohio Jury Instructions provide the following recommended instruction on transferred intent:

> TRANSFERRED INTENT (ADDITIONAL). If you find that the defendant (intended) (was attempting) to cause the death of or injury to (insert name of intended victim) and that his/her act (unintentionally) (accidentally) caused the death of or injury to (insert name of actual victim), then the defendant is as responsible as if his/her act had harmed (insert name of intended victim).

*Ohio Jury Instructions*, CR Section 417.01 (Rev. Jan. 10, 2015).

{¶56} Assuming without deciding that the trial court erred when it selected the "was attempting" language from the foregoing instruction rather than the "intended" language, Tyler has not shown that the instruction resulted in plain error. As noted, jury instructions must be reviewed as a whole. *Id.* at ¶ 38. "'Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party.'" *Lollis*, 2014-Ohio-684, at ¶ 35, quoting *Wozniak*, 90 Ohio App.3d at 410. The trial court instructed the jury several times that it was the State's burden to prove each element of Tyler's charges beyond a reasonable doubt. It also issued extensive, detailed instructions on the element of purpose and intent for purposes of Tyler's murder charge and specified that the jury could not find Tyler guilty unless it found that the State had proved each element of murder beyond a reasonable doubt. Tyler has not explained why the court's instructions, taken as a whole, failed to adequately convey the elements of murder to the jury. *See* App.R. 16(A)(7). Nor has he shown that the instructions, taken as a whole, were so misleading that they prejudicially affected his substantial rights. *See Lollis* at ¶ 35, quoting *Wozniak* at 410. Upon review, we cannot conclude that the trial court committed plain error when it instructed the jury on transferred intent. As such, Tyler's fourth assignment of error is overruled.

**Assignment of Error VI**

**Imposition of duplicitous sentences.  (Sic.)**

{¶57}  In his sixth assignment of error, Tyler argues that the trial court erred in its sentencing determination when it: (1) failed to merge his convictions for murder and felonious assault; (2) failed to merge his conviction for carrying a concealed weapon with his convictions for murder and felonious assault; (3) sentenced him on his felonious assault conviction as well as its attendant firearm specification; and (4) ordered his firearm specifications to run consecutively.  For the following reasons, we reject his arguments.

{¶58}  In reviewing a felony sentence, "[t]he appellate court's standard of review is not whether the sentencing court abused its discretion."  R.C. 2953.08(G)(2).  "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence" that (1) "the record does not support the trial court's findings under relevant statutes," or (2) "the sentence is otherwise contrary to law."  *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1.  Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶59}  "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution, which prohibits multiple punishments for the same offense."  *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23.  The statute provides, in relevant part:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or

similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(A), (B). The Supreme Court of Ohio has held that when a defendant's conduct supports multiple offenses, that defendant may be convicted of all offenses if "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph three of the syllabus.

Murder and Felonious Assault

{¶60} First, Tyler argues that the trial court erred when it failed to merge his convictions for murder and felonious assault as allied offenses. Yet, those offenses pertained to two separate victims. If a defendant's conduct results in offenses involving separate victims, "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) * * *." *Id.* at ¶ 26. Because Tyler's convictions for murder and felonious assault were offenses of dissimilar import, the trial court did not err by sentencing him on both offenses. *See id.* Accordingly, we reject his argument to the contrary.

Carrying a Concealed Weapon and Felonious Assault with a Firearm Specification

{¶61} Next, Tyler argues that the trial court erred when it (1) failed to merge his conviction for carrying a concealed weapon with his other convictions, and (2) sentenced him on both his felonious assault conviction and its attendant firearm specification. As to the latter, he notes that his felonious assault conviction required the State to prove that he caused physical harm by means of a deadly weapon. *See* R.C. 2903.11(A)(2). When a defendant is convicted under that subsection, Tyler argues, a penalty enhancement for carrying a firearm is nonsensical as a matter of law because it punishes an offender twice for the same conduct. He claims that,

"[i]n these narrow circumstances[,] [an] additional sentence for [a] gun specification to [a] felonious assault charge [is] unconstitutional." Though Tyler's two arguments are distinct, we address them together based on his failure to preserve them for review.

{¶62} At sentencing, Tyler made an extremely limited argument regarding the foregoing convictions. His entire argument reads as follows:

> [DEFENSE COUNSEL]: * * * [I]n terms of the mechanics of the sentence, * * * we think that [Counts 1, 2, and 3] merge as well as one gun specification for these three counts.
>
> We would urge upon the Court -- we'd urge the Court to consider the [carrying a concealed weapon count], Count 5 as renumbered, as being duplicative of --
>
> THE COURT: I think it's Count 4.
>
> [DEFENSE COUNSEL]: Count 4 renumbered, felonious assault, as being duplicative in terms of the gun specification, in terms of the use of the gun in the felonious assault conviction and the use of the gun in the felony murder. It just seems to be duplicative, and we'd ask the Court to consider running that concurrent rather than consecutive.
>
> I [] have nothing to say about whether these counts, the gun specifications, should be run consecutively or concurrently.
>
> I'd ask the Court to consider running them concurrently because of the facts of the case * * *, this being generally one act, although there are two victims * * *.

Following Tyler's argument, the court merged Counts 1, 2, and 3 and their attendant firearm specifications,[1] but sentenced Tyler on his remaining counts and specifications. It ordered his prison terms for murder, felonious assault, and the firearm specifications linked to those counts to run consecutively. It ordered his prison term for carrying a concealed weapon to run concurrently with that sentence.

---

[1] Counts 1, 2, and 3 respectively charged Tyler with the murder, felony murder, and felonious assault of D.H.

{¶63} Tyler never argued that his conviction for carrying a concealed weapon should merge with his other offenses as an allied offense of similar import. Instead, he asked the court to issue a concurrent sentence on that count due to its "duplicative" nature. Because the merger of allied offenses will result in a single sentence rather than concurrent sentence terms, *see State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, ¶ 28-29, we will not construe Tyler's argument as a request to merge his conviction as an allied offense. At that point, Tyler had already agreed that other counts should "merge." He never asked the court to "merge" his conviction for carrying a concealed weapon with his convictions for murder and felonious assault. Accordingly, at best, he forfeited any argument in that regard. *See State v. May*, 9th Dist. Lorain No. 17CA011204, 2018-Ohio-2996, ¶ 9. Because Tyler has not attempted to argue plain error on appeal, we will not construct an argument on his behalf. *See id.* We, therefore, reject Tyler's argument insofar as it concerns the merger of his conviction for carrying a concealed weapon.

{¶64} We further reject Tyler's argument that the court erred as a matter of law when it sentenced him on both his felonious assault conviction and the firearm specification linked to that count. Tyler never argued that a constitutional violation occurs when a defendant is sentenced for a violation of R.C. 2903.11(A)(2) as well as a related firearm specification. By failing to raise his argument in the lower court, he forfeited it for purposes of his appeal. *See State v. Honey*, 9th Dist. Medina No. 08CA0018-M, 2008-Ohio-4943, ¶ 20 ("Constitutional errors to which a defendant does not object in the trial court are forfeited for purposes of appeal."). Moreover, Tyler has not argued plain error on appeal, and this Court will not develop

an argument on his behalf. *See May* at ¶ 9. We, therefore, reject Tyler's argument insofar as it concerns the constitutionality of his sentence for felonious assault.

<u>Consecutive Terms on Firearm Specifications</u>

{¶65} Finally, Tyler argues that the trial court erred when it ordered the sentences on his two firearm specifications to run consecutively. Assuming without deciding that Tyler did not forfeit this argument in the lower court, we have recognized that trial courts are required "'to order consecutive service of certain specifications under R.C. 2929.14(B)(1)(g) * * *.'" *State v. Urconis*, 9th Dist. Wayne No. 16AP0061, 2017-Ohio-8515, ¶ 10, quoting *State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 54. Because Tyler was convicted of murder and felonious assault and both of his convictions carried attendant firearm specifications, the trial court was required to impose consecutive prison sentences on both of his specifications. *See* R.C. 2929.14(B)(1)(g). Therefore, we reject Tyler's argument to the contrary. Tyler's sixth assignment of error is overruled.

III.

{¶66} Tyler's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

RHONDA KOTNIK, Attorney at Law, for Appellant.

MARK H. LUDWIG, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO GUEST, Assistant Prosecuting Attorney, for Appellee.